**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COLONY PLACE SOUTH, INC. <br> d/b/a VOLVO CARS PLYMOUTH <br> and 25 FALMOUTH ROAD, INC. <br> d/b/a VOLVO CARS CAPE COD <br><br> Plaintiffs, <br><br> v. <br><br> VOLVO CAR USA LLC, FIDELITY <br> WARRANTY SERVICES, INC., <br> VOLVO CAR FINANCIAL SERVICES <br> U.S., LLC <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.: 1:21-CV-11226 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

_____)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS I, II, III, V, VI**

Plaintiffs, COLONY PLACE SOUTH, INC. d/b/a VOLVO CARS PLYMOUTH ("Volvo Plymouth") and 25 FALMOUTH ROAD, INC. d/b/a VOLVO CARS CAPE COD ("Volvo Cape Cod") (collectively the "Plaintiffs" or "Premier Volvo Dealerships") pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts hereby move this Court for an order granting it summary judgment under Counts I, II, III, V and VI. In support thereof, Plaintiffs state as follows:

**Introduction**

Plaintiffs filed this lawsuit against Defendants Volvo Car USA, LLC ("VCUSA"), Volvo Car Financial Services U.S., LLC ("VCFS") and Fidelity Warranty Services, Inc.

("FWS") based on Defendants' sale of a Volvo-branded Prepaid Maintenance Program product ("PPM") that violates the Massachusetts Franchise Practices Act's requirement that dealers are reimbursed at their retail rates for services provided under prepaid maintenance programs.  M.G.L.A. 93B § 9(b)(1).  This requirement is the Massachusetts' Legislature's response to franchisors attempting to unfairly shift service-related costs onto their dealers in Massachusetts.

VCUSA has had a prepaid maintenance program for many years, under which it paid retail labor rates to its dealers in Massachusetts.  (SUMF ¶ 80).[1]  However, in 2016, VCUSA decided to have VCFS administer the PPM instead. *Id.* at ¶ 81.  VCFS then executed an agreement with FWS to assist in the PPM administration along with a number of other service-related Financial and Insurance products sold through Massachusetts Volvo dealers.  *Id.* at ¶ 82.  When VCFS and FWS took over administering the PPM, VCUSA argued that it had no longer had an obligation to pay retail labor rates under the PPM, because the program was being "offered" by VCFS and FWS, not VCUSA.  VCUSA attempted to circumvent its statutory obligations to pay retail labor rates under the PPM by shifting the administrative responsibility for the same to its closely-affiliated financial services company, VCFS, but retaining all of the dealer and public facing benefits of the program. *Id.* at ¶¶ 51-64, 81-118. To wit, the PPM is still called the Volvo PPM; Dealers still must sell the PPM; the PPM is listed on VCUSA's website as a product VCUSA offers.

VCUSA's tactics are nothing more than smoke and mirrors and were contemplated, and prohibited, by the Massachusetts' Legislature.  Even assuming VCUSA's assertion is correct that it delegated its authority under the PPM, the activity remains illegal, because

---

[1] Citations to Plaintiffs' Statement of Undisputed Material Facts submitted in support of Their Motion for Summary Judgment will be cited as "SUMF at ¶ ___" with a corresponding paragraph number.

the Massachusetts Franchise Practices Act prohibits the use of an agent to accomplish what VCUSA cannot accomplish.  Nevertheless, VCUSA maintains significant oversight, control, and commercial interest in the sale and satisfaction of the PPM, which is tilted the "Volvo PPM" and is listed on VCUSA's website as its program.  *Id.* at ¶¶ 81-118.  On these bases, Plaintiffs are entitled to summary judgment in their favor under Counts I, II, III, V and VI.

**MEMORANDUM OF LAW**

**I.     Summary Judgment Standard Applicable to the Instant Motion.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment.  *Id.*  In reviewing the evidence, the court is required to "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The court is also instructed to "disregard all evidence favorable to the moving party that jury is not required to believe."  *Id.* at 151.  Stated differently, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     Pertinent Principles of Statutory Interpretation.

The instant case presents issues of first impression under the Massachusetts Motor Vehicle Franchise Act.  M.G.L.A. 93B § 1, *et seq.*  To the undersigned's knowledge, there are no reported decisions interpreting Chapter 93B sections 9(b)(1), 9(b)(2)(vii) or 4(c)(12). Thus, the questions presented in this Motion must be decided based on the undisputed material facts and their application to the statutory claims.  Evaluation of each of Plaintiffs' claims will necessarily involve following the principles of statutory interpretation noted *infra*.

When conducting statutory interpretation, the starting point is always the plain language of the statute.  *Commonwealth v. Escobar*, 490 Mass. 488, 493 (2022); *Anderson v. National Union Fire Ins. Co. of Pittsburgh PA*, 476 Mass. 377, 381, 67 N.E.3d 1232 (2017).  The goal is to construe the statute so that effect is given to all its provisions and no language is rendered superfluous or inoperative.  *Boston Police Patrolmen's Ass'n, Inc. v. Police Dept' of Boston*, 446 Mass. 46, 50 (2006).  As to specific terms in a statute, where a definition is provided, it governs and otherwise, "we derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions."  *Escobar*, 490 Mass. at 493-94 (quoting *Commonwealth v. Morasse*, 446 Mass. 113, 116, 842 N.E.2d 909 (2006)). Moreover, a court should strive to construe the statute so that it serves its intended purpose.  *Boston Police Patrolmen's Ass'n*, 446 Mass. at 50.

However, even where the language of the statute is unambiguous and can be interpreted in a straightforward manner consistent with the legislative intent, a court should not interpret the statute in a way that creates an absurd result.  *Escobar*, 490 Mass. at 493; *Martha's Vineyard Land Bank Comm'n v. Assessors of W. Tisbury*, 62 Mass.App.Ct.

25, 27-28, 814 N.E.2d 1147 (2004) (quotations omitted).  Where the statutory language itself "does not provide a definite answer to the question," other sources, such as the legislative history, can be referenced to clarify the meaning and the Legislature's intent. *Matter of the Liquidation of Am. Mut. Liab. Ins. Co.*, 440 Mass. 796, 801-02, 802 N.E.2d 55 (2004) (quoting *Boylston v. Commissioner of Revenue*, 434 Mass. 398, 401, 749 N.E.2d 684 (2001)).  But, ultimately, a court must "avoid any construction of statutory language which leads to an absurd result," or that otherwise would frustrate the Legislature's intent.  *Bellalta v. Zoning Bd. of Appeals of Brookline*, 481 Mass. 372, 378 (2019) (quoting S.Singer, 3C Statutes and Statutory Construction § 77:7, at 689 (8th ed. 2018) (Singer)); see also *Worcester v. College Hill Props.*, LLC, 465 Mass. 134, 138, 987 N.E.2d 1236 (2013).  Courts in Massachusetts will not adopt "a literal construction of a statute if the consequences of doing so are absurd or unreasonable, such that it could not be what the Legislature intended."  *Commonwealth v. Wassilie*, 482 Mass. 562, 573 (2019) (quoting *Ciani v. MacGrath*, 481 Mass. 174, 178, 114 N.E.3d 52 (2019)).  Thus, "[w]here the draftsmanship of a statute is faulty or lacks precision, it is [the Court's] duty to give [it] a reasonable construction."  *Id.* (quoting *Capone v. Zoning Bd. of Appeals of Fitchburg*, 389 Mass. 261, 267, 50 N.E.3d 157 (2016)).

### III.    The Purpose of the Massachusetts Motor Vehicle Franchise Act.

The Massachusetts Motor Vehicle Franchise Act (the "Act") is similar to other statutes that have been enacted nationwide to address imbalances in bargaining power between large, multi-national automotive manufacturers and their local, franchised new motor vehicle dealers.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 100 n. 4 (1978) (citing S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956)) ("Dealers are with

few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer.").

As the commercial relationship evolved, reimbursements for warranty repairs, maintenance plans and extended service contracts became a point of contention between manufacturers and distributors and their franchised dealerships. *All. of Auto. Mfrs. v. Gwadosky*, 304 F. Supp. 2d 104, 106–07 (D. Me. 2004), aff'd *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005), cert. denied 547 U.S. 1143 (2006) (collecting cases involving disputes between manufacturers or distributors and dealerships regarding reimbursement for repairs to motor vehicles) ("The public tends to see the dealer-manufacturer relationship as symbiotic and unitary: the manufacturer designs and builds vehicles; the dealer sells and repairs them, all to their greater economic advantage. Beneath the surface, however, is an uneasy, often roiling relationship."); see also, S. Rep. No. 266, 107th Cong., 2d Sess., (2002), 2002 WL 32972956, at p. 5 ("For example, manufacturers can determine the dealer's stock with allocation of hot selling models; manufacturers can accelerate or delay warranty payments with great discretion, or ***alter the rate paid for certain types of work that the dealer performs to honor the manufacturer's warranty***) (emphasis supplied); *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F. Supp. 819, 824 (D. Me. 1994); *Alliance of Auto. Mfrs., Inc. v. Currey*, 984 F.Supp.2d 32, 40 (D.Conn. 2013) aff'd 610 Fed.Appx. 10 (2d Cir.2015), cert. denied 136 S.Ct. 1374 (2016); *G/C Volkswagen Corp. v. Volkswagen of America, Inc.*, No. 97 CIV. 8364(JGK), 1998 WL 799174, at *4 (S.D.N.Y. Nov. 16, 1998) (noting that requiring "fair and reasonable compensation" was intended to ensure dealers are reimbursed for parts and labor at their

retail rates, even when performing warranty repairs); *Don Johnson Hayward Motors, Inc. v. General Motors LLC*, Case No. 16-cv-1350-pp, 2018 WL 4568822, at *6 (E.D. Wis. 2018).

In Massachusetts specifically, courts have long recognized the remedial purpose of the Act is to address manufacturers' and distributors' "potentially oppressive power" relative to their affiliated dealers. *Am. Honda Motor Co. v. Bernardi's Inc.*, 432 Mass. 425, 432 (2000) (quoting *Beard Motors, Inc. v. Toyota Motor Distribs., Inc.*, 395 Mass. 428, 432, 480 N.E.2d 303 (1985)). Stated differently, the Act aims to eliminate

> industry practices which may be reasonably thought to operate unfairly or coercively.  It is designed to protect franchisees from having to succumb to dictation by manufacturers pressing their own interests in disregard of the health of other elements in the trade and perhaps ultimately of the welfare of the public.

*Massachusetts State Auto. Dealers Ass'n, Inc. v. Tesla Motors MA, Inc.*, 469 Mass. 675, 679, 15 N.E.3d 1152 (2014) (quoting *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 322, 381 N.E.2d 908 (1978)).  Keeping this purpose at the forefront and with the statutory interpretation principles laid out above as a guide, it is clear that Plaintiffs are entitled to summary judgment as a matter of law.

## **ARGUMENT**

I.     **Plaintiffs Are Entitled to Summary Judgment under Counts I and II Because Chapter 93B Section 9(b)(1) Requires VCUSA to Reimburse Plaintiffs at Retail Labor Rates for Work Performed under a PPM and VCUSA Refuses to Do So.**

Counts I and II of Plaintiffs' Complaint both proceed under chapter 93B section 9(b)(1) but they seek different forms of relief with Count I asking for damages and Count II seeking declaratory and injunctive relief.  Thus, they will be addressed in tandem. Chapter 93B section 9(b)(1) states that:

> A manufacturer or distributor shall within a reasonable time fulfill its obligations under all express warranty agreements made by it with respect to a product manufactured, distributed or sold by it and shall adequately and fairly compensate any motor vehicle dealer who, under its franchise obligations, furnishes labor, parts, and materials under the warranty or **maintenance plan**, extended warranty, certified preowned warranty or a service contract, issued by a manufacturer or its common entity, unless issued by a common entity that is not a manufacturer…For the purposes of motor vehicle dealers, **fair and adequate compensation shall not be less than the rate and price customarily charged for retail customer repairs** and computed under paragraph (2)… (emphasis added)

Pertinent to this litigation, that statute requires that a manufacturer or distributor (or its common entity) compensate a dealer at its retail labor rate (a/k/a "fair and adequate compensation" a/k/a the rate computed under paragraph (2)[2]) for furnishing labor, parts and materials as part of its franchise obligations under a maintenance plan. *Id.* The statute is clear that whether characterized as a warranty, maintenance plan, or service contract, if it is issued by a manufacturer or distributor or its common entity, then dealers furnishing labor, parts and materials thereunder must be compensated at their retail labor rate.

In the instant matter, there can be little dispute that the requirement for retail labor rates is triggered by VCUSA's issuance of the PPM. First, Plaintiffs are clearly "dealers" with "franchise agreements" and VCUSA is subject to the Act as a "distributor" operating in the commonwealth. M.G.L.A. 93B § 1; (SUMF at ¶¶ 1-9). Second, Plaintiffs are obligated to sell the PPM and offer concomitant maintenance services under the PPM pursuant to their franchise obligations. (SUMF at ¶¶ 31-50). Indeed, every Volvo dealer in Massachusetts sells the PPM. *Id.* at ¶ 74. The PPM qualifies as a Volvo Accessory under Plaintiffs' Franchise Agreements. *Id.* at ¶¶ 40-41. VCUSA can terminate Plaintiffs

---

[2] The "rate and price customarily charged for retail customer repairs and computed under paragraph (2)" is more commonly known as the "retail labor rate" and/or "retail parts markup" and that nomenclature will be used throughout this Motion.

for failure to comply with their agreements with FWS, a Volvo Affiliate under the Franchise Agreements, and Plaintiffs are specifically obligated to sell the PPM by various clauses in the Franchise Agreements. *Id*. at ¶¶ 40-41, 48-49.  Third, there is no question that Plaintiffs furnish labor, parts and materials to all customers with PPMs, regardless of which Volvo dealer sold that customer his or her particular PPM. *Id*. at ¶ 24.  Fourth, Plaintiffs are not paid retail labor rates for their work on PPMs.  Instead, Plaintiffs are reimbursed based on the "tier" of each customer's PPM.[3] *Id*. at ¶¶ 119-127. The rates under the tiers have no relationship to Plaintiffs' retail labor rates and instead are based on the price paid for the PPM by the dealer that sold it to the customer.  *Id*.  Thus, Plaintiffs are not paid retail labor rates as required by section 9(b)(1).  *Id*.

Finally, it also clear that the PPM is issued by VCUSA, ensuring the statute's application.  M.G.L.A. 93B § 9(b)(1); (SUMF at ¶¶ 51-64, 81-118).  While the PPM may have been creatively structured so that VCFS or FWS is the "administrator", the ultimate decision maker and beneficiary is VCUSA. *Id*.  To wit, the following facts are clear from the documents submitted in support of Plaintiffs' Motion and reinforced by deposition testimony of Defendants' representatives:

- The PPM is advertised as the "Volvo PPM." The marketing materials go on to note that VCUSA-trained technicians will be doing the service, using only Volvo-brand genuine parts, and all of the maintenance intervals and services performed are based on VCUSA's guidelines. (SUMF at ¶¶ 88-95, 101-105).

---

[3] The "tier" of a customer's PPM refers to the reimbursement rate for dealer's labor in providing maintenance services under the PPM that corresponds to that PPM's sale price to the dealer and in turn the customer.

- The marketing materials even state that the PPM will be accepted at any Volvo dealer nationwide.[4] *Id.* at ¶ 103.

- VCUSA advertises and explains the PPM on its own website.[5] *Id.* at ¶¶ 101-102.

- There is even a "welcome letter" for the PPM that is sent to customers who purchase it signed by VCUSA's Director of Aftersales and uses the pronoun "our" to describe the PPM (i.e., VCUSA's). *Id.* at ¶¶ 107-108.

- VCUSA is a direct beneficiary of the PPM because it is a tool for customer retention by VCUSA following the sale of a vehicle by its dealers. VCFS's corporate representative also reiterated this shared purpose. The PPM is a mechanism for customer retention by VCUSA to ultimately support future purchases of new motor vehicles and other VCUSA offerings. *Id.* at ¶¶ 89-93.

- VCUSA representatives attend quarterly and annual meetings with FWS to receive updates on the sales of the PPM as well as the other products FWS administers. *Id.* at ¶ 112.

- VCUSA's dealer portal is used to push information out to the dealer network relating to the PPM. And its warranty submission system is used for submission of reimbursements for dealers for the key fob replacement benefits under the PPM. *Id.* at ¶¶ 100, 114.

---

[4] In depositions, VCUSA and VCFS attempted to argue that Plaintiffs could refuse to provide services to customers pursuant to the PPM as independent businesses. However, putting Plaintiffs in such an untenable position is pure coercion – Plaintiffs are offered an illusory choice of either performing services under the PPM below their market or retail labor rates or turning away customers who are told that the PPM will be accepted by any Volvo dealer nationwide. The witnesses admitted that customers would be dissatisfied if they were turned away, potentially providing VCUSA with grounds to terminate Plaintiffs' Franchise Agreements.

[5] *See* https://www.volvocars.com/us/l/protection-plans/ & https://www.volvocars.com/images/v/-/media/market-assets/us/applications/dotcom/pdfs/protection-plans/volvo-prepaid-maintenance-digital-brochure-v2.pdf

- VCUSA was involved in the selection and ***approval*** of FWS as the administrator of the PPM.  And, VCUSA even insisted on certain provisions in the Master Services Agreement and related to the administration of the PPM. *Id.* at ¶¶ 82-84, 88, 113.

- Sales of the PPM lead to increased sales of Volvo Genuine Parts by VCUSA because the PPM requires dealers use them.  VCUSA insisted this provision be included in the agreement by which FWS began administering the PPM.  *Id.* at ¶¶ 89-90.

- The PPM is not sold by any other entity or retailer than Volvo-brand dealers. *Id.* at ¶ 73.

- Plaintiffs are graded on their customer satisfaction from PPM service encounters, a key obligation under their Franchise Agreements. *Id.* at ¶¶ 115-117.

- When VCUSA amends its maintenance schedule, those changes are always incorporated into the PPM. *Id.* at ¶¶ 68, 94-95.

- VCUSA representatives communicate with Volvo dealers regarding the PPM, and will specifically answer dealer inquiries regarding the PPM.  The PPM is discussed at monthly regional meetings of dealers and VCUSA representatives alongside other aspects of dealers' fixed operations.[6]  *Id.* at ¶¶ 96-99.

- VCUSA employees receive penetration reports each month showing how all dealers are performing with regards to selling PPMs.  Other service contracts and warranty penetration are also analyzed alongside the PPM in these penetration reports. *Id.* at ¶¶ 96, 106.

---

[6] Fixed operations is an industry term for the various operations of new motor vehicle dealerships unrelated to the sale of new motor vehicles like service business, parts sales, body shop work and more.

- And unsurprisingly, the Volvo-branded PPMs administered by FWS make up 90% of dealers' sales of PPMs while only 10% are derived from non-branded products. *Id.* at ¶¶ 91-93.

- FWS's corporate representative explained very clearly that the value of the Volvo-branded PPM is directly derived from the trust, significance and importance Volvo customers place on the Volvo brand, without which the products would not be nearly as successful. *Id.* at ¶¶ 90-93, 107-108.

Therefore, VCUSA is the issuer of the PPM and must be required to pay retail labor rates under the same.[7]

In accordance with statutory interpretation principles and the Massachusetts Motor Vehicle Franchise Act's purpose, it is clear this is the Legislature's intended result. *Escobar*, 490 Mass. at 493. Indeed, distributor, dealership, franchise and fair and adequate compensation (a/k/a retail labor rates) are all defined by the Act itself and clearly apply. M.G.L.A. 93B §§ 1, 9(b)(2); see *Escobar*, 490 Mass. at 493-94.

The term "issue" is not defined by the statute. Merriam Webster's defines issue as "to put forth or distribute usually officially", "to send out for sale or circulation", or "to cause to come forth." *Issue,* Merriam Webster's Collegiate Dictionary (10th ed. 1993). Similarly, Black's Law Dictionary defines issue as "to be put forth officially" or "to send out or distribute officially". *Issue,* Black's Law Dictionary (7th ed. 1999). Under these definitions, VCUSA is clearly issuing the PPM. Volvo advertises and provides information on the PPM on its website. (SUMF at ¶¶ 101-102, 105-108). It sends communications relating to the

---

[7] Defendants will undoubtedly point to the Master Services Agreement executed between VCFS and FWS to argue that VCUSA is not the issuer of the PPM. Plaintiffs disagree that agreement controls the question, because of the practical realities of how the PPM is administered, the clear benefits to VCUSA, and the other persuasive facts regarding VCUSA's involvement and the Volvo branding noted herein.

PPM, including a "welcome letter" to PPM purchasers signed by VCUSA's Director of Aftersales. *Id.* at ¶¶ 101-108.  The PPM exists as a customer retention tool for VCUSA. *Id.* at ¶¶ 86-93. All of the marketing materials label the PPM as the "Volvo" PPM. *Id.* at ¶¶ 101-108.  On these bases and those noted *supra*, VCUSA is thus required to reimburse Plaintiffs at retail labor rates for maintenance work performed pursuant to the PPM under Chapter 93B section 9(b)(1).

Alternatively, if VCUSA is not the ultimate issuer of the PPM, VCFS, a common entity, is and section 9(b)(1) still applies.  Defendants will undoubtedly argue that VCFS is a common entity that "is not a manufacturer" and thus avoids application of the requirement to pay retail labor rates.  M.G.L.A. 93B § 9(b)(1).  However, such an interpretation of the statute would lead to an absurd result and cannot be what the Massachusetts Legislature intended. *Wassilie*, 482 Mass. at 573.  If VCFS qualified as common entity under the statute's definition, the exception would swallow the rule itself.  The statute notes that the maintenance plan or service contract must be issued by a "manufacturer or its common entity, unless issued by a common entity that is not a manufacturer."  M.G.L.A. 93B § 9(b)(1).  It is impossible to envision an instance where the common entity of a manufacturer is also a manufacturer because that would eliminate the logic for creating a common entity.  And, if the exception were taken to its logical conclusion, every manufacturer could simply create a common entity to issue all of its warranties, maintenance plans and service contracts and avoid fairly and reasonably reimbursing dealers at their retail labor rates.  This was clearly not the Legislature's intent in enacting a comprehensive scheme to regulate how manufacturers and distributors reimburse Massachusetts motor vehicle dealerships for warranty and other service-related

work.  *Capone*, 389 Mass. at 267; *Massachusetts State Auto. Dealers Ass'n, Inc.*, 469 Mass. at 679.

As this Court will see *infra*, the close relationship between VCUSA and VCFS counsels that VCUSA is the ultimate issuer of the PPM, and even if not, VCUSA cannot use VCFS or FWS to avoid its statutory obligations to reimburse Plaintiffs at their retail labor rates for maintenance services provided under the PPM because doing so would undermine the intent of the Legislature in enacting section 9(b)(1).

**II.      Plaintiffs Are Entitled to Summary Judgment under Count V Because VCUSA Cannot Use VCFS and FWS to Circumvent Its Statutory Obligations to Pay Plaintiffs Retail Labor Rates for Maintenance Work under a PPM.**

Chapter 93B section 4(c)(12) prohibits VCUSA from using VCFS and FWS to circumvent its statutory obligation to pay "fair and adequate compensation" for maintenance services provided under the PPM embodied in section 9(b)(1).  Specifically, chapter 93B section 4(c)(12) states that:

> It shall be deemed a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative: (12) to act to accomplish, either directly or indirectly through any parent company, subsidiary, or agent, what would otherwise be prohibited under this chapter on the part of the manufacturer or distributor.  This section shall not limit the right of any parent company, subsidiary, or agent to engage in business practices otherwise lawful in accordance with the usage of the trade in which it is engaged.

Thus, even if this Court finds that VCUSA is not actually "issuing" the PPM itself under section 9(b)(1), section 4(c)(12) prohibits it from using VCFS and/or FWS to evade its obligations under section 9(b)(1).

Here, there is no dispute that VCUSA qualifies as a distributor under the Massachusetts Motor Vehicle Franchise Practices Act.  M.G.L.A. 93B § 1; (SUMF at ¶¶ 1-9).  Nor is there a dispute that Plaintiffs are both dealers with franchises or franchise

agreements as defined by the Massachusetts Motor Vehicle Franchise Practices Act. *Id.* There is also no reasonable dispute that VCFS qualifies as "any parent company, subsidiary, or agent" of VCUSA. M.G.L.A. 93B § 4(c)(12); (SUMF at ¶¶ 1-9, 51-64). Neither VCUSA's nor VCFS's corporate representatives disputed the close affiliation between VCUSA and VCFS. *Id.* VCFS exists to further VCUSA's aims of selling more new motor vehicles and concomitant parts and services. (SUMF at ¶¶ 1-9, 51-64, 89-93). VCFS offers financing ***only*** to Volvo-brand dealers and purchasers of Volvo motor vehicles. *Id.* at ¶¶ 11-12. VCFS's parent company is the same as VCUSA. *Id.* at ¶ 55. VCUSA and VCFS even share office space and employees regularly transfer between the two entities. *Id.* at ¶¶ 56-61. Thus, even if VCFS is the ultimate issuer of the PPM, section 4(c)(12) prohibits it and VCUSA (and FWS) from acting in concert to attempt to evade the requirements under section 9(b)(1) to reimburse Plaintiffs at retail labor rates for maintenance work performed under the PPM. Plaintiffs have clearly showed the section 9(b)(1) applies to the PPM in all other respects *supra* so if VCUSA is not liable under Counts I and II it, VCUSA acting in concert with VCFS and FWS are liable under Count V.

Importantly, before VCFS and FWS began administering the PPM, VCUSA administered its own PPM. (SUMF at ¶¶ 79-80). That PPM paid dealers their retail labor rate for performing services thereunder. *Id.* FWS suggested that VCFS and it administer the PPM instead of VCUSA to grow sales and VCUSA agreed. *Id.* at ¶ 81. However, this was simply an arbitrary change in claim processing, in an attempt to sell more products ultimately benefitting VCUSA's customer retention.[8] In fact, VCUSA participated in the process to select FWS and ***VCFS sought VCUSA's approval*** prior to executing the

---

[8] Notably, this change also allowed VCUSA to ostensibly deny that it was offering the PPM and evade statutory requirements to pay dealers retail labor rates thereunder.

agreement with FWS. *Id.* at ¶¶ 82-84.  VCUSA even required that certain terms be included in that agreement. *Id.* at ¶ 88, 113.  Interestingly, that same agreement required that the products FWS administers pay Volvo dealers retail labor rates. *Id.* at ¶¶ 121-122.  And, in fact, the Volvo Extended Service Contract, administered pursuant to the same agreement as the PPM, pays retail labor rates. *Id.* at ¶¶ 121-124.  Highlighting the arbitrariness of the switch to administration of the PPM by VCFS and FWS, PPM maintenance begins at the 40,000-mile interval on a new Volvo motor vehicle; however, there are three maintenance intervals prior to that (10,000 miles, 20,000 miles and 30,000 miles) where VCUSA provides complimentary maintenance to purchasers of its new motor vehicles. *Id.* at ¶¶ 65, 67, 125.  For those complimentary maintenance services, VCUSA reimburses dealers at their retail labor rates. *Id.*  Thus, somehow, because of FWS's insertion into the picture to administer the PPM at 40,000 miles and beyond, VCUSA believes it can evade the requirement to pay retail labor rates.  This is exactly the sort of action by a manufacturer or distributor that the Massachusetts Motor Vehicle Franchise Act was promulgated to regulate in order to avoid oppression of dealers and injury to the consuming public. *Massachusetts State Auto. Dealers Ass'n, Inc.*, 469 Mass. at 679.

FWS and VCFS may argue that the PPM is otherwise lawful because application of section 4(c)(12) to the PPM "limits the right" of VCFS and/or FWS "to engage in business practices otherwise lawful in accordance with the usage of the trade in which [they are] engaged."  However, this exception clearly does not apply, because it is unlawful to promulgate manufacturer-related warranty, maintenance or service programs that do not pay dealers fair and adequate compensation (i.e., less than the dealer's approved retail rate).  M.G.L.A. 93B § 9(b)(1).  In fact, the Massachusetts Legislature was very clear in

this respect by including a laundry list of the types of programs that were prohibited in the statute (e.g., "warranty or maintenance plan, extended warranty, certified preowned warranty or a service contract…") and, by forbidding a manufacturer or its common entity from offering any of these programs without paying dealers retail labor rates. *Id.* By expanding the application of section 9(b)(1) to include common entities, the Massachusetts Legislature evidenced a clear intent that no affiliate of a manufacturer could be used to circumvent the requirement to pay retail labor rates on all branded service or maintenance programs and warranty work. *Boston Police Patrolmen's Ass'n*, 446 Mass. at 50; *Am. Honda Motor Co.*, 432 Mass. at 432. In short, refusing to pay fair and adequate compensation to dealers doing work under manufacturer-branded PPMs is not otherwise lawful under Massachusetts law.

This is another instance where if the exception were applied literally, it would swallow the rule itself, an absurd outcome. *Wassilie*, 482 Mass. at 573 (2019). And, doing so, especially in the context of the Act's remedial scheme, would necessarily frustrate the Legislature's intent. *Boston Police Patrolmen's Ass'n*, 446 Mass. at 50. Thus, the only logical result is that if section 9(b)(1) does not apply to the PPM to forbid VCUSA's actions then section 4(b)(12) must and again VCUSA is required to pay Plaintiffs their retail labor rates.

### III. Plaintiffs Are Entitled to Summary Judgment under Counts III and VI Because VCUSA Cannot Avoid Paying "Fair and Reasonable Compensation" under the PPM Simply by Employing VCFS and/or FWS to Administer the PPM.

Counts III and VI are not derivative of Count I, but they are related. Counts III and VI are brought under chapter 93B section 9(b)(2)(vii), which states that:

>A manufacturer or distributor shall not implement or continue a policy, procedure or program to any of its dealers in the commonwealth for compensation which is inconsistent with this subsection.

Count III names VCUSA and FWS, whereas Count VI names VCUSA and VCFS. Plaintiffs' claims are that by delegating administration of the PPM to VCFS and/or FWS that VCUSA "implemented a policy, procedure or program" that is inconsistent with VCUSA's obligations to pay Plaintiffs "fair and adequate compensation" or retail labor rates for providing services under the PPM. Here, VCUSA implemented the PPM (or "program") in a manner that is inconsistent with its obligations under the Act. Specifically, VCUSA is obligated to reimburse dealers at their retail rate, and VCUSA's PPM does not do that. Thus, the Act makes clear that VCUSA cannot avoid application either by use of an agent, or implementation of a program that does not pay dealers their retail rate.

The PPM violates section 9(b)(1), as explained in greater detail *supra*. This particular statutory provision reinforces the intent of the Massachusetts Legislature to ensure that dealers are paid their retail labor rates for service work done at the behest of a manufacturer or distributor, no matter whether pursuant to a warranty, extended service contract or maintenance plan, and specifically prohibits attempts to work-around such requirement. *Boston Police Patrolmen's Ass'n*, 446 Mass. at 50; *Am. Honda Motor Co.*, 432 Mass. at 432.

FWS's arbitrary insertion into administering the PPM again counsels for the application of this statute. VCUSA administered its own PPM previously and offered retail labor rates thereunder. (SUMF at ¶¶ 79-80, 125). VCUSA offers complimentary maintenance services at 10,000, 20,000 and 30,000 miles to purchasers of new Volvo motor vehicles and pays retail labor rates on those service encounters. *Id.* The service encounter does not somehow transform at 40,000 miles when FWS begins administering

the PPM.  The dealers' costs are the same, the inputs are essentially the same, and the service work is performed by the same technicians in the same location. *Id.* at ¶ 124.  The only difference is VCUSA's attempt to use FWS as a shield to avoid application of section 9(b)(1).

Additionally, the design of PPM with a tiered reimbursement structure is also a violation of section 9(b)(1). *Id.* at ¶¶ 119-125.  Instead of receiving the retail labor rate under the PPM, Plaintiffs must pay more money for the PPM to be entitled to their retail labor rate. *Id.* This is in contravention of the requirement for "fair and reasonable compensation" under a maintenance program in Massachusetts.

Thus, even if VCUSA itself is not offering the PPM in violation of that statute, its decision to shift responsibility for the PPM from VCUSA to VCFS and/or FWS and thereafter cease paying retail labor rates to dealers for performing maintenance services under the same is forbidden.  The application of this statute is based on its plain language and the undisputed material facts noted herein.

## <u>CONCLUSION</u>

For the reasons contained herein, Plaintiffs are entitled to summary judgment against VCUSA under Counts I and II.  Alternatively, Plaintiffs are entitled to summary judgment against VCUSA, VCFS and FWS under Count V.  Or, Plaintiffs are entitled to summary judgment against VCUSA and FWS under Count III or VCUSA and VCFS under Count VI.  In any event, VCUSA must pay Plaintiffs retail labor rates under the PPM.

Dated: November 18, 2022.

Respectfully Submitted,

/s/ W. Kirby Bissell
Jason T. Allen (FBN 25659)
W. Kirby Bissell (FBN 0100166)
Bass Sox Mercer
2822 Remington Green Circle
Tallahassee, Florida 32308
Tel. (850) 878-6404
jallen@dealerlawyer.com
kbissell@dealerlawyer.com

and

James J. McNulty
James J. McNulty (BBO 339940)
Law Office of James J. McNulty
40 Court Street, Suite 1150
Boston, Massachusetts 02108
Tel. (617) 263-3300
jjm@jjmcnultylaw.com

*ATTORNEYS FOR PLAINTIFFS*
*COLONY PLACE SOUTH, INC.*
*d/b/a VOLVO CARS PLYMOUTH*
*and 25 FALMOUTH ROAD, INC.*
*d/b/a VOLVO CARS CAPE COD*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed through the Electronic Court Filing system on November 18, 2022, and served electronically on all counsel of record.

/s/ W. Kirby Bissell
Jason T. Allen